UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TERRY TEENIER,

    Plaintiff,                                               Case No. 16-
                                                                        Hon.

v.

CHARTER COMMUNICATIONS, LLC,

    Defendant.
_____/

THE MASTROMARCO FIRM
VICTOR J. MASTROMARCO, JR. (P34564)
KEVIN J. KELLY (P74546)
Attorneys for Plaintiff
1024 N. Michigan Avenue
Saginaw, Michigan 48602
(989) 752-1414
vmastromar@aol.com
kkelly615@gmail.com
_____/

### PLAINTIFF'S COMPLAINT & DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, TERRY TEENIER, by and through his attorneys, THE MASTROMARCO FIRM, and hereby complains against Defendant, CHARTER COMMUNICATIONS, LLC, stating as follows:

### COMMON ALLEGATIONS

1.    That Plaintiff is a resident of the County of Saginaw, State of Michigan.

2. That Defendant is a foreign limited liability company authorized to conduct business in the State of Michigan and doing so in the County of Saginaw, State of Michigan.

3. That the amount in controversy exceeds the sum of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), exclusive of costs, interest, and attorney fees.

4. That this Honorable Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

5. That on or about February 14, 2005, Plaintiff began working for Defendant.

6. That Plaintiff continued to work for Defendant for approximately the next ten (10) years.

7. That in mid June 2014, Plaintiff received a telephone call from Shawn Felker, a supervisor of hourly employees and Plaintiff's direct report.

8. That Mr. Felker informed Plaintiff that there were representatives of the International Brotherhood of Electrical Workers (hereinafter referred to as "IBEW") were on site at Defendant's Saginaw facility.

9. That Plaintiff subsequently contacted Director Greg Culver and Vice President Dave Slowick.

10. That Plaintiff was specifically instructed to travel to the Saginaw

facility, stand by the IBEW representatives to ensure they did not go onto Defendant's property, and take notes of Defendant's employees who took flyers from the IBEW representatives.

11. That while en route to the Saginaw facility, Plaintiff repeated the instructions to Mr. Felker and another supervisor, Chad Erskin.

12. That while on site, Plaintiff observed a technician, who was slated for promotion to a supervisor position, Jason Zarchoko, approach IBEW representatives and begin yelling obscenities at them.

13. That Ms. Zarchoko confirmed that Manager Bob Morgan instructed him to give the IBEW representatives "hell," because he was not yet a supervisor.

14. That after the IBEW representatives left, Plaintiff contacted Mr. Culver and reported what had transpired.

15. That later in the day, Plaintiff received a notice to participate in a conference call among managers.

16. That the conference call included several members of higher management, including: Regional Vice President of Human Resources, Sherry Olds; Regional Vice President Joe Bullion; Michigan KMA Vice President Dave Slowick; Manager of Technical Operations, Bob Morgan; Manager of Technical Operations, Jeff Stork; Manager of Technical Operations, Jason Hannah; Director of Technical Operations, Lloyd Collins; Manager of Technical Operations, Russ

Ortega; Manager of Technical Operations, Mark Nimowitz; Director of Human Resources Harth Goulette; Director Greg Gulver; and Plaintiff.

17. That during the conference call, Vice President Boullion provided an update of what had transpired at the Saginaw facility with the IBEW representatives.

18. That another participant went over Defendant's rules for responding to union activity and provided an explanation of Defendant's stand point on the issue.

19. That this participant further went over the "TIPS" method, which provides that Plaintiff and other managers were not allowed to threaten, intimidate, persuade, or spy.

20. That Mr. Boullion further stated that the participants should keep their eyes out for union activity and report any such activity to Vice President Olds.

21. That later in the day, Plaintiff received an invite to a conference call scheduled for the next morning.

22. That Mr. Bullion informed the participants that there had been union activity in Bay City.

23. That the Bay City Manager, Jeff Stork, stated that IBEW representatives were present and had handed out flyers.

24. That Mr. Boullion then asked if there were any other instances of

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

union activity around the state; there were none.

25. That Mr. Boullion further said that he had spoken to contacts at Comcast and learned that several of Defendant's employees had recently attended a meeting for the union that represents Comcast employees in Flint.

26. That Mr. Boullion then asked if any of the participants knew which employees had attended the meeting and instructed managers to find out who those employees were.

27. That also during the conference call, Mr. Boullion identified an employee that Defendant suspected was the instigator behind the union activity and Mr. Morgan identified some of the employee's co-workers who were friends with him.

28. That Mr. Boullion instructed Plaintiff to meet with the employee and find out whether or not the employee was involved and to then report back.

29. That Plaintiff subsequently met with the employee and discussed whether he was involved in the union activity.

30. That over the course of the following two (2) weeks, Plaintiff was participating in conference calls about the union activity upwards of three to four times per day.

31. That during one such conference call, Mr. Morgan named several individuals that were suspected of being involved in the union activity.

32. That Mr. Buillion then instructed Plaintiff to isolate four (4) of the suspected employees from other employees, especially service technicians.

33. That Mr. Bullion also instructed the managers when they saw the employees suspected of being involved in the union activity speaking with other employees to interrupt the conversations.

34. That subsequent to the conference call, Plaintiff reassigned the identified employees.

35. That in July 2014, during a conference call involving supervisors, Mr. Bullion announced that all employees would be attending a "union avoidance meeting."

36. That Mr. Bullion instructed supervisors to be active participants in the union avoidance meetings and to sit in on as many meetings as possible.

37. That supervisors were further instructed to have employees who had previously been in unions to speak out against the unions at these meetings.

38. That Mr. Bullion further advised supervisors to study employee's body language to determine who appeared uncomfortable as they may be instigators of union activity.

39. That Plaintiff attended union avoidance meetings in Saginaw, Bay City, Mt. Pleasant, Kalamazoo, and Holland.

40. That Defendant held daily conference calls to debrief management as

to what transpired at the meetings.

41. That after one such conference call, Mr. Culver called Plaintiff and told him that it looked really bad that two of the most vocal employees were under Mr. Felker's supervision (which would also be under Plaintiff's supervision).

42. That Mr. Culver interrogated Plaintiff on whether Mr. Felker was involved in the union activity and instructed Plaintiff to keep an eye on him.

43. That in August 2014, Plaintiff decided to reassign the employees he had previously been instructed to isolate.

44. That on or about August 20, 2014, Plaintiff discussed this move with Mr. Felker and the fact that Plaintiff was going to move some of the employees under a different supervisor.

45. That during the week of September 8, 2014, Plaintiff put the decision to move three employees into effect and notified Mr. Culver of his decision.

46. That on or about September 21, 2014, Plaintiff's father became very ill as he dealt with terminal lung cancer and was taken to and admitted to the hospital.

47. That on the same day, Plaintiff contacted Mr. Culver and advised Mr. Culver of the situation with his father and that he needed to take Monday, September 22, 2014 off.

48. That on or about September 22, 2014, Plaintiff again contacted Mr.

Culver that he would need to take the entire week off to care for his father.

49. That Defendant's actions demonstrate that Defendant was very concerned at the time that Plaintiff was taking a leave of absence that its employees were engaging in union activity.

50. That Plaintiff's father's illness caused Plaintiff to need to take time off while Defendant was relying on Plaintiff to obtain information regarding employees' unionization attempts.

51. That notwithstanding the fact that Plaintiff provided Defendant sufficient information to determine that his leave was FMLA-qualifying, Defendant failed to provide Plaintiff with an eligibility notice and a rights and responsibilities notice as required by the FMLA. *See* 29 C.F.R. § 825.300(b)-(c).

52. That during the week of September 22, 2014, Plaintiff kept in contact with Mr. Culver and some of his team members.

53. That while Plaintiff was on his leave of absence, Plaintiff's father passed away.

54. That on or about September 29, 2014, Plaintiff returned to work.

55. That during the morning, Plaintiff attempted to contact two supervisors, Mr. Felker and Rob Lothian; however, Plaintiff was having a very hard time getting a hold of either.

56. That after approximately two and half hours, Plaintiff found Mr.

Lothian.

57. That while Plaintiff spoke with Mr. Lothian, he noted Mr. Lothian acted withdrawn and would not make eye contact.

58. That Plaintiff also received notice that Mr. Culver was present in the Bay City office.

59. That Mr. Culver had not previously come to the Bay City office unannounced as Mr. Culver's office was located across the state in Zeeland, Michigan and would always let Plaintiff know when he came to Bay City.

60. That because of Mr. Lothian's odd behavior and the unannounced presence of Mr. Culver, Plaintiff left a satellite office to meet with Mr. Culver.

61. That when Plaintiff met with Mr. Culver, Mr. Culver appeared surprised to see him and asked Plaintiff what he was doing there.

62. That Plaintiff responded by stating that he was working his normal shift and asked what brought Mr. Culver to town.

63. That Mr. Culver would typically act very open towards Plaintiff; however, on this occasion he acted differently, was hesitant, and said he had some business to tend to.

64. That Plaintiff then asked Mr. Culver whether someone was under investigation.

65. That Mr. Culver's eyes widened and in higher than usual tone said,

9

"What do you mean?"

66. That Plaintiff then explained that people were treating him differently that day and it made him believe that someone was in trouble.

67. That Mr. Culver said he was not at liberty to discuss the situation.

68. That Plaintiff then stated that he must be under investigation, to which Mr. Culver responded, "Is there a reason you should be under investigation?"

69. That Plaintiff responded, "Of course not," and further explained that he had been off the last week.

70. That later in the afternoon, Plaintiff sent Mr. Culver an email explaining that he was not in the right mindset after his father had passed away and would be taking the rest of the week off as bereavement leave.

71. That from September 30, 2014 through October 9, 2014, numerous members of Plaintiff's team were contacted by a Human Resources Generalist, Stephanie Peters.

72. That Plaintiff was not provided any information as to why his team members were being spoken to by the Human Resources Department.

73. That on or about October 7, 2014, Ms. Peters contacted Plaintiff to meet in her office.

74. That when Plaintiff arrived, he noted that Mr. Culver was also present.

75. That Ms. Peter started the conversation by informing Plaintiff that

they were conducted an investigation, but she would not state what the investigation was about.

76. That Ms. Peters then asked Plaintiff what his relationship was with several of employees under his supervision that Ms. Peters had previously contacted.

77. That Ms. Peters asked numerous questions including whether Plaintiff knew the employees prior them working for Defendant and what was his relationship with them outside of work.

78. That on or about October 14, 2014, while Plaintiff was attending a training class, Plaintiff received a telephone call from Mr. Culver asking him to meet in Ms. Peters' office.

79. That when Plaintiff arrived at Ms. Peters' office, he was met by Mr. Culver and Human Resources Director Harth Goullette.

80. That Mr. Culver then informed Plaintiff that as a result of the investigation, Defendant was terminating Plaintiff's employment for allegedly violating Defendant's code of conduct and employee handbook.

81. That when Plaintiff asked specifically what he had allegedly violated, Mr. Goullette replied that he was not at liberty to discuss.

82. That Defendant's proffered reasons for terminating Plaintiff's employment are pretextual in nature.

THE MASTROMARCO FIRM | 1024 N. Michigan Avenue | Saginaw, Michigan 48602 | (989) 752-1414

83. That Defendant retaliated against Plaintiff for taking FMLA-qualifying leave during a time period when Defendant was concerned that employees were attempting to unionize.

84. That Defendant's actions constitute retaliation in violation of the Family and Medical Leave Act.

85. That pursuant to 29 U.S.C. § 2617, Plaintiff hereby makes a claim for the following elements of damages directly and proximately caused by Defendant's unlawful actions:

    (a) Any wages, salary, employee benefits, or other compensation denied or lost to Plaintiff by reason of Defendant's violations of the FMLA;

    (b) The interest on said wages, salary, employee benefits, and other compensation at the prevailing rate;

    (c) An additional amount as liquidated damages equal to the above two sums;

    (d) Reasonable attorney fees, reasonable expert witness fees, and other costs of this action; and

    (e) Any such equitable relief as may be appropriate.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all other legal and/or equitable relief this Court deems just.

## COUNT I – RETALIATION IN VIOLATION OF THE FAMILY & MEDICAL LEAVE ACT

86. That Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 85 of his Common Allegations, word for word and paragraph for paragraph, as if fully restated herein.

87. That the Family and Medical Leave Act prohibits an employer from discriminating or retaliating against an employee for having exercised or attempted to exercise FMLA rights.  29 C.F.R. § 825.220(c).

88. That at all times material hereto, Defendant was and is a covered employer as defined by the FMLA and the applicable federal regulations.  29 C.F.R. § 825.104.

89. That at all times material hereto, Plaintiff was an eligible employee as defined by the FMLA and the applicable federal regulations.  29 C.F.R. § 825.110.

90. That employers covered by the FMLA are required to grant leave to eligible employees to care for the employee's parent with a serious health condition.  29 C.F.R. § 825.112(a)(3).

91. That at all times material hereto, Plaintiff's father suffered from a serious health condition as defined by the FMLA and the applicable federal regulations.  29 C.F.R. §§ 825.113, 825.114.

92. That Plaintiff provided to Defendant, including Mr. Culver, sufficient information to reasonable determine that the FMLA may apply to the time Plaintiff

requested off to care for his father while his father was admitted on an inpatient basis to the hospital.  *See* 29 C.F.R. § 825.303(b).

93. That Plaintiff's take a leave of absence for an FMLA-qualifying reason was activity protected under the FMLA.  *See Byrant v. Dollar General Corp.*, 538 F.3d 394 (6th Cir. 2008); *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014).

94. That Plaintiff suffered a materially adverse employment action by virtue of Defendant's termination of his employment.

95. That a causal connection exists between Plaintiff's protected activity and the materially adverse action.

96. That a causal connection is demonstrated, at least in part, by the close temporal proximity between Plaintiff's protected activity and the materially adverse action.  *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007).

97. That a causal connection is demonstrated, at least in part, by Defendant's failure to comply with its regulatory notice obligations.  *Scorsone v. Wal-Mart Stores, Inc.*, Case No. 13-cv-14418, 2014 2207002 (E.D. Mich. May 28, 2014).

98. That Defendant's reasons for terminating Plaintiff's employment are pretextual in nature.

99. That Defendant's actions constitute retaliation in violation of the Family and Medical Leave Act.

100. That pursuant to 29 U.S.C. § 2617, Plaintiff hereby makes a claim for the following elements of damages directly and proximately caused by Defendant's unlawful actions:

    (a) Any wages, salary, employee benefits, or other compensation denied or lost to Plaintiff by reason of Defendant's violations of the FMLA;

    (b) The interest on said wages, salary, employee benefits, and other compensation at the prevailing rate;

    (c) An additional amount as liquidated damages equal to the above two sums;

    (d) Reasonable attorney fees, reasonable expert witness fees, and other costs of this action; and

    (e) Any such equitable relief as may be appropriate.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) in addition to costs, interest, and attorney fees along with any and all other legal and/or equitable relief this Court deems just.

                                        Respectfully submitted,
                                        THE MASTROMARCO FIRM

Dated: September 7, 2016     By:    */s/ Victor J. Mastromarco, Jr.*
                                        VICTOR J. MASTROMARCO, JR. (P34564)
                                        Attorneys for Plaintiff
                                        1024 N. Michigan Avenue
                                        Saginaw, Michigan 48602
                                        (989) 752-1414
                                        vmastromar@aol.com

## **DEMAND FOR TRIAL BY JURY**

NOW COMES Plaintiff, TERRY TEENIER, by and through his attorneys, THE MASTROMARCO FIRM, and hereby demands a trial by jury on all of the above issues, unless otherwise expressly waived.

                                                Respectfully submitted,
                                                THE MASTROMARCO FIRM

Dated: September 7, 2016    By:   */s/ Victor J. Mastromarco, Jr.*
                                                  VICTOR J. MASTROMARCO, JR. (P34564)
                                                  Attorneys for Plaintiff
                                                  1024 N. Michigan Avenue
                                                  Saginaw, Michigan 48602
                                                  (989) 752-1414
                                                  vmastromar@aol.com