UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY TEENIER,

Plaintiff,

v.

CHARTER COMMUNICATIONS, LLC,

Defendant.

_____/

Case No. 16-cv-13226

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
PATRICIA T. MORRIS

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [14]**

**I. INTRODUCTION**

On September 7, 2016, Terry Teenier ("Plaintiff") filed a complaint against

Charter Communications, LLC ("Defendant"). Dkt. No. 1. Plaintiff's complaint

alleges that Defendant violated the Family and Medical Leave Act (FMLA) by

retaliating against Plaintiff for exercising FMLA rights. 29 C.F.R. § 825.220(c). *Id.*

Presently before the Court is Defendant's Motion for Summary Judgment,

filed on June 15, 2017. Dkt. No. 14. Plaintiff filed a response on July 6, 2017, Dkt.

No. 16, and Defendant replied on July 20, 2017, Dkt. No. 17. Upon review of the

briefing, the Court concludes that oral argument will not aid in the resolution of the

instant motion. Accordingly, the Court will resolve Defendant's present motion on

the briefs. *See* E.D. Mich. LR 7.1(f)(2).

1

For the reasons discussed herein, the Court GRANTS Defendant's Motion for Summary Judgment [14].

## II. BACKGROUND

Plaintiff began working for a subcontractor of Defendant in the late 1990s, Dkt. No. 16-2, p. 3 (Pg. ID 505), but quit voluntarily in October 2000, Dkt. No. 14-12, p. 18 (Pg. ID 453). Plaintiff returned to Defendant's employment in 2005 and was eventually promoted to a position as the Manager of Field Audit and Technical Quality Assuarance, supervising approximately 56 people. Dkt. No. 16-3; Dkt. No. 16-2, p. 10 (Pg. ID 512).

Around May or June 2014, there was an effort by some of Defendant's employees to unionize with The International Brotherhood of Electrical Workers. *See* Dkt. No. 14-8, p. 4 (Pg. ID 388). Defendant's management sought to prevent unionization, *see* Dkt. No. 16-10, and managers took part in a series of phone conferences on union avoidance. *See* Dkt. No. 16-11 (providing calendar invitations for phone conferences from July 14, 2014 to August 11, 2014).[1]

---

[1] Plaintiff asserts in his deposition that these calls continued until the termination of his employment in October 2014, but his own exhibits do not contain evidentiary support for that allegation. *Compare* Dkt. No. 16-2, p. 19 (Pg. ID 521) (stating that, "[t]he calls continued up until [his] termination," but also admitting that he does not remember when the last call occurred) *with* Dkt. No. 16-11 (providing August 11, 2014 as the last phone conference).

Plaintiff alleges that he was told by a superior to isolate four employees under his supervision because of their suspected union involvement. Dkt. No. 16-2, p. 22 (Pg. ID 524). These four employees—James DeBeau, Jonathan French, Kent Payne, and Raymond Schoof—were all audit technicians who reported to Shawn Felker, a supervisor under Plaintiff. *Id*. at 22–25 (Pg. ID 524–27). Plaintiff complied with the request to isolate these employees by reassigning them to more remote locations for two to three weeks. *Id*. Plaintiff also reassigned DeBeau, French, and Schoof from Felker's supervision to another supervisor, Rob Lothian, in the beginning of September. *Id*. at 26; Dkt. No. 14-9, p. 13 (Pg. ID 403).

On Friday, September 19, 2014, Lothian approached Defendant's Human Resources Generalist Stephanie Peters with concerns about Plaintiff. Dkt. No. 14-9, pp. 12–15 (Pg. ID 402–05). Lothian expressed concern about the employees who had been transferred from Felker's team to his team because he had heard that these audit technicians performed below their productivity targets, which would reflect poorly on him. *Id.* at 13–14. Lothian was particularly concerned that these employees were less productive because of their friendship with Plaintiff, who Lothian believed pulled employees away to perform "special projects" of non-work-related activities on company time. *Id.* at 14. Lothian provided an example of the men laying sod at Schoof's home during work hours, photographs of which he said he saw on Felker's cell phone. *Id.* Peters told Lothian to "continue to be

observant and report directly to" her, as she would "involve the appropriate individuals." Dkt. No. 14-9, p. 15 (Pg. ID 405).

On Sunday, September 21, 2014, Plaintiff's father became ill and was admitted to the hospital. Dkt. No. 14-12, p. 10 (Pg. ID 445). Plaintiff took the following week off work and his father passed away on Friday, September 26, 2014. *Id*. Plaintiff's supervisor, Greg Culver, approved his leave, telling him to "do what you need to do, you have plenty of vacation and sick time." Dkt. No. 14-12, p. 10 (Pg. ID 445).

While Plaintiff was on leave, Lothian updated Peters on September 24, 2016 and September 26, 2014 regarding the special projects issue he first mentioned on September 19, 2014. Dkt. No. 14-9, p. 15 (Pg. ID 405). Lothian reported that DeBeau stated he was approved to work on a special project: work on a haunted house owned by one of Defendant's preferred vendors, Pat Jozeska of Complete Auto. *Id*. Lothian told Peters that DeBeau allegedly said Plaintiff was taking care of his numbers so the time spent on this non-work activity would not hurt his performance. *Id*. Lothian said he contacted Plaintiff and Plaintiff told him that "this is the last one [of the special projects]—I promise." *Id*. at 16. Lothian also said that Felker was also frustrated with the special projects, but did not want TJ to lose his job. Id. Lothian was not sure that Felker would be honest in the investigation, and that Schoof and DeBeau were close friends with TJ outside work. *Id*.

Shortly after Peters's conversation with Lothian on Friday, September 26, 2014, Culver called Peters to relay a call he had just received from Plaintiff. *Id*. Culver told Peters that Plaintiff had talked about Lothian being paranoid and that he planned to speak with him when he returned. *Id*. Peters told Culver about what Lothian had reported to her, and the two agreed to meet the following Monday to discuss their concerns. *Id*.

When Plaintiff returned to work that morning, he could not get ahold of Lothian. Dkt. No. 16-2, p. 30 (Pg. ID 532). When Plaintiff found Lothian later, he thought Lothian was acting abnormally and avoiding eye contact. *Id*. Someone in the dispatch office alerted Plaintiff that Culver was in the office that day, and Plaintiff went to look for him. *Id*. at 31–32. Plaintiff questioned Culver about why he was present in the office without notifying Plaintiff and asked him who was being investigated. *Id*. at 33–34. Since Culver would not disclose who was being investigated, Plaintiff concluded that he was the target of the investigation. *Id*. at 34.

Plaintiff emailed Culver an apology later in the day and notified him that he would be taking additional time off for bereavement leave. *Id*. at 35. Plaintiff took from September 29, 2014 to October 3, 2014 off as bereavement leave. Dkt. No. 14-12, p. 16 (Pg. ID 451). When approving Plaintiff's bereavement leave, Culver told Plaintiff to take care of his father and wished him well. Dkt. No. 14-12, p. 11

(Pg. ID 446). By Plaintiff's admission, Culver did not say anything that suggested Plaintiff would not be allowed to take leave. *Id*. at 10–11.

Between Monday, September 29, 2014 and Wednesday, October 8, 2014, Peters met with ten employees, including Plaintiff, to investigate the allegations made by Lothian. Dkt. No. 14-9, pp. 16–29 (Pg. ID 406–19). Felker denied knowing of any non-work-related projects being completed on company time, but acknowledged that DeBeau had gone to the haunted house while his company vehicle was being repaired at Complete Auto. Dkt. No. 14-9, pp. 16–17 (Pg. ID 406–07). Schoof also denied that any employees were performing non-work tasks while on the clock, and stated that the sod had been installed at his house in the evening after work. *Id*. at 18–19. DeBeau stated that he had performed a sweep of an apartment complex and spent a day verifying addresses, which he considered to be "special projects." *Id.* at 19–20. He also had visited the haunted house to look at plumbing while his company truck was being repaired. *Id*. French stated that he had previously picked up boxes near a college campus, which he considered a "special project," and that Lothian had told French about rumors of employees laying sod on company time. *Id.* at 20–21. Kent Payne and Aaron Rhodes were also unaware of any non-work-related activities being performed on company time. *Id.* at 22–24.

Peters interviewed Plaintiff on Monday, October 6, 2014. Dky. No. 14-9, pp. 24–26 (Pg. ID 414–16). He stated the only special projects he has assigned his employees were having employees pick up boxes, or having some employees help others who were not trained in specific areas. *Id.* He also told Peters that he had been alerted by other employees that he was currently under investigation. *Id.*

The only employee whose account cooroborated Lothian's allegations was Lucas Watkins, who admitted most of his information was second-hand. *Id.* at 27. Watkins stated that Plaintiff covered up numbers to account for employees doing non-work activities on company time and that "you don't mess with [Plaintiff], especially if you aren't part of the inner circle" of friends Plaintiff had hired. *Id.*

Peters concluded the investigation on October 8, 2014. *Id.* at 29–30. She concluded that where discrepancies existed between Plaintiff's and Lothian's description of events, Lothian's account was more credible. *See* Dkt. No. 14-9, p. 8 (Pg. ID 398). Peters thought that Lothian "was always very honest, even if he thought he was going to be in trouble" and that Lothian "had no reason not to be honest." *Id.* Peters further concluded that Plaintiff had violated Defendant's Code of Conduct, Timekeeping Policy, and the Performance Standards in the Charter Employee Handbook. Dkt. No. 14-9, pp. 29–30 (Pg. ID 419–20).

Peters recommended to her supervisors, Sherry Farquhar and Harth Goulette, and Plaintiff's supervisor, Culver, that Plaintiff, Debeau, Felker, French,

and Schoof should all be terminated. Dkt. No. 14-9, pp. 9–10 (Pg. ID 399–400). Termination was agreed upon. *See* Dkt. No. 14-4, p. 6 (Pg. ID 360); Dkt. No. 14-9, pp. 9–10 (Pg. ID 399–400). Culver terminated Plaintiff and the four other employees on Wednesday, October 14, 2014. Dkt. No. 14-2, pp. 99–107 (Pg. ID 332–40).

Plaintiff, Debeau, Felker, French, and Schoof filed Unfair Labor Practices charges against Defendant with the National Labor Relations Board after their terminations. Dkt. No. 14-5, p. 6 (Pg. ID 366) (DeBeau); Dkt. No. 14-7, p. 7 (Pg. ID 380) (Felker); Dkt. No. 14-8, p. 6 (Pg. ID 390) (French); Dkt. No. 14-10, p. 8 (Pg. ID 428) (Schoof); Dkt. No. 14-12, p. 30 (Pg. ID 465) (Plaintiff). Plaintiff filed his ULP charge on January 14, 2015, alleging that Defendant fired him because he "recently refused to unfairly treat several employees who were involved with attempts to unionize Charter technicians." Dkt. No. 14-12, p. 30 (Pg. ID 465) Plaintiff withdrew his charge after he learned it could be dismissed for lack of jurisdiction because he was a mangerial employee. Dkt. No. 14-12, p. 17 (Pg. ID 452). He filed this case on September 7, 2016. Dkt. No. 1.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's*

*Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION

As an initial note, the Court clarifies that its inquiry is limited to whether Defendant terminated Plaintiff in retaliation for utilizing his rights under the FMLA. The Court makes no finding as to whether Defendant terminated Plaintiff because of the union activity of men he supervised, as such activity lies outside the protections of the FMLA.

Defendant argues that it is entitled to summary judgment on Plaintiff's only claim, alleging FMLA retaliation. Dkt. No. 14, p. 18 (Pg. ID 216). First, Defendant argues that Plaintiff cannot make out a *prima facie* case of retaliation where he has no evidence that his leave had any impact on Defendant's decision to terminate him. *Id*. Second, Defendant asserts that Plaintiff has no evidence to suggest that it

did not reasonably believe that Plaintiff violated Defendant's policy and then lied about it. The Court finds that Defendant is entitled to summary judgment. A detailed analysis is below.

### 1. Plaintiff's FMLA Claim

The FMLA provides an eligible employee up to twelve weeks of leave within a twelve-month period "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). This leave must be used to actually care for an immediate family member whose health condition is sufficiently serious to warrant FMLA protection. *Katoula v. Detroit Entm't, LLC*, 557 F. App'x 496, 498 (6th Cir. 2014); *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 337 (6th Cir. 2009).

The Sixth Circuit recognizes two distinct theories for FMLA recovery: (1) the "entitlement" or "interference" theory, under 29 U.S.C. § 2615(a)(1); and (2) the "retaliation" or "discrimination" theory, under 29 U.S.C. § 2615(a)(2). *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). In the present case, Plaintiff only asserts a retaliation claim.

### a. Plaintiff's FMLA Retaliation Claim

The FMLA prohibits employers from discharging or discriminating against any individual for opposing practices made unlawful by the FMLA. 29 U.S.C.

§ 2615(a)(2). The Sixth Circuit applies the *McDonnell Douglas* burden-shifting framework to retaliation claims that turn on circumstantial evidence. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a *prima facie* case of FMLA retaliation, an employee must show:

(1) the employee was engaged in an activity protected by the FMLA;
(2) the employer knew that the employee was exercising his or her rights under the FMLA;
(3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him or her; and
(4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). "A plaintiff's burden in establishing a *prima facie* case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). A successfully pleaded *prima facie* case of retaliation results in the burden being shifted onto the employer to present a legitimate, non-discriminatory reason for its decision. *Donald*, 667 F.3d at 761. If the employer adequately carries this burden, then the employee must show that the employer's stated reasons are mere pretext for unlawful discrimination in order to survive summary judgment. *Id.* at 761–62.

### i. Whether Plaintiff Engaged In An Activity Protected By The FMLA

Based on the arguments presented at the summary judgment stage, it does not appear that there is a dispute that Plaintiff's leave from September 22, 2014 to September 26, 2014 to care for his father's illness was an FMLA-qualifying activity.[2] Viewing the evidence in the light most favorable to the non-moving party, the Court finds that Plaintiff's leave to care for his ill father was an activity protected by the FMLA.

### ii. Whether Defendant Knew Plaintiff Was Exercising His FMLA Rights

Defendant makes some arguments in its Motion for Summary Judgment that seem to nebulously assert it did not realize Plaintiff's leave to care for his father was a FMLA activity because he took paid leave. Dkt. No. 14, p. 25 (Pg. ID 223). Although Defendant did not flesh out this argument fully, the Court will weigh the evidence presented on this issue for the sake of clarity.

Defendant never provided Plaintiff with FMLA documents to complete upon his taking of this leave from September 22nd to September 26th. Dkt. No. 16-2, p.

---

[2] There is also no dispute that the following week of leave that Plaintiff took from the afternoon of September 29, 2014 to October 3, 2014, did not qualify as FMLA leave because Plaintiff's father had already passed away on September 26, 2014. Plaintiff took this leave as bereavement and vacation leave. Dkt. No. 14-2, p. 112 (Pg. ID 345).

29 (Pg. ID 531). Thus, Defendant did not label this week as official FMLA leave. Instead, Plaintiff took paid sick leave for this week. Dkt. No. 14-2, p. 5 (Pg. ID 238); Dkt. No. 14-2, p. 112 (Pg. ID 345).

"[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (alteration in original) (quoting *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)). "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). Instead, the FMLA requires only that the employee "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id*. "The employee's burden is not heavy." *Wallace*, 764 F.3d at 586. Rather, the employer bears the burden of obtaining any additional required information that may be needed to establish eligibility. 29 C.F.R. § 825.303(b).

Viewing the evidence in the light most favorable to the non-moving party, Plaintiff gave Defendant sufficient information to shift the burden to Defendant to provide him with FMLA documents or obtain additional information. Accordingly, the Court finds Plaintiff adequately established that Defendant knew or should have known that he was taking FMLA-qualifying leave from September 22, 2014 to September 26, 2014.

### iii. Whether There Was A Causal Connection Between Plaintiff's FMLA Activity And The Adverse Employment Action

This final factor requires Plaintiff to provide sufficient evidence that a reasonable jury could find a causal connection between Plaintiff's FMLA activity and the adverse action taken by Defendants. *Donald*, 667 F.3d at 761.

In the Sixth Circuit, "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007). The relevant timeframe for the Court's consideration is the " 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires."[3] *Bush v. Compass Grp. USA, Inc.*, No. 16-6258, 2017 WL 1097140, at *10 (6th Cir. Mar. 23, 2017). "Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with

---

[3] As happens periodically in the Sixth Circuit, there is conflicting precedent on this issue. *Compare Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 452 (6th Cir. 2017) ("However, contrary to Bush's implicit assumption, the relevant timeframe for us to consider in determining whether there was a causal connection between the plaintiff's FMLA leave and the adverse employment action is the 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires.") *with Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 410 (6th Cir. 2014) ("However, we have measured temporal proximity from the date FMLA leave expired, not just when the employee first requested it, for the purposes of measuring temporal proximity."). Since neither case is published, overruled, or explicitly distinguished from the other, the Court will err on the side of caution by adopting the standard stated in the more recent decision (*Bush*), which cited to published, rather than unpublished, precedent.

'other evidence of retaliatory conduct to establish causality.' " *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008)).

Plaintiff argues that causal connection is demonstrated by the proximity of his termination to his FMLA-qualifying leave and because Defendant did not adequately comply with FMLA notice obligations.[4] Dkt. No. 1, p. 14 (Pg. ID 14). Plaintiff notified Defendant of his intent to take FMLA-qualifying leave on Sunday, September 21, 2014. Dkt. No. 14-12, p. 10 (Pg. ID 445). Defendant terminated Plaintiff 23 days later on Wednesday, October 14, 2014. Dkt. No. 14-2, pp. 99–107 (Pg. ID 332–40).

For the purposes of this motion, the Court will assume without deciding that the few short weeks between Plaintiff's request for FMLA-qualifying leave and his termination are sufficient to make a *prima facie* showing of a causal connection.[5]

---

[4] Plaintiff cites to *Scorsone v. Wal-Mart Stores, Inc.*, Case No. 13-cv-14418, 2014 2207002 (E.D. Mich. May 28, 2014) in support of its second point. The *Scorsone* order addresses a motion to dismiss, which utilizes a different standard than a summary judgment motion. This unpublished district court case is inapplicable to the present proceedings.

[5] As *Bush* addressed in a footnote, there is a perplexing and unresolved split in circuit precedent as to whether "temporal proximity evidence is sufficient to both establish a *prima facie* showing of FMLA retaliation, and rebut an employer's proffered non-discriminatory reasons for the adverse employment action, or it is insufficient to do either." 683 F. App'x at 451 n.5 (6th Cir. 2017). Unfortunately, despite addressing the fact that this conflict exists, *Bush* did not provide any guidance as to how it should be resolved. *See id.*

*See Johnson v. Fifth Third Bank*, No. 16-1111, 2017 WL 1244879, at *5 (6th Cir. Apr. 5, 2017) (finding that a two week period between the plaintiff notifying her employer of FMLA leave and her termination was sufficient to make a *prima facie* showing of causal connection). Nevertheless, as address below, this temporal proximity is insufficient, by itself, to establish pretext.

### iv. Whether Defendants Articulated A Legitimate, Non-Discriminatory Reason For Terminating Plaintiff

If a plaintiff states a *prima facie* case of FMLA retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To meet its burden, Defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action." *Id.* at 571 (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, Defendant presented evidence that prior to Plaintiff's FMLA-qualifying leave, an employee supervised by Plaintiff reported Plaintiff and other coworkers for completing non-work-related tasks while on company time. Following several weeks of investigation and nearly two dozen interviews, Defendant's Human Resources Department concluded that Lothian's allegations

were meritorious and that Plaintiff and other employees were being untruthful. Defendant terminated Plaintiff and four employees he supervised on the same day.

Without citing to any case law, Plaintiff alleges that this reason cannot hold because there is conflicting evidence as to who made the decision to terminate. Dkt. No. 16, pp. 30–31 (Pg. ID 496–97). After reviewing the exhibits, it is clear to the Court that there was no dispute of fact as to whether Plaintiff's supervisors and Human Resources employees believed that Plaintiff should be terminated and the difference in testimony has not created a question of material fact. *See* Dkt. No. 14-4, p. 6 (Pg. ID 360); Dkt. No. 14-9, pp. 9–10 (Pg. ID 399–400); *see also Anderson*, 477 U.S. at 252 (concluding "that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact").

Plaintiff also alleges in his response that Peters and Lothian doctored the investigation as a cover-up after the fact, but has not provided any evidence other than his conclusory statements as to this suspicion. Dkt. No. 16, pp. 32–33 (Pg. ID 498–99). He has not provided testimony or emails from any individuals with firsthand knowledge of the investigation timeline to create an issue of material fact as to the veracity of the investigation dates. *See Arendale v. City of Memphis*, 519

F.3d 587, 605 (6th Cir. 2008) ("In order to survive summary judgment, Plaintiff cannot rely on conjecture or conclusory accusations.").

Thus, the Court finds that Defendant has carried its burden of demonstrating a legitimate, nondiscriminatory reason for terminating Plaintiff.

### v. Whether Defendants' Reason Was Pretext For Discrimination

A plaintiff may rebut a defendant's showing of legitimate nondiscriminatory reason by showing that this reason was mere pretext, designed to mask retaliation. *Singleton v. Select Specialty Hosp.-Lexington, Inc.*, 391 F. App'x 395, 400 (6th Cir. 2010). "To demonstrate pretext at the summary judgment stage, the plaintiff must show by a preponderance of the evidence either (1) that the employer's proffered reasons for the adverse employment action had no basis in fact, (2) that the proffered reasons were not the true reason, or (3) that they were insufficient to motivate discharge." *Rhoades v. Standard Parking Corp.*, 559 F. App'x 500, 502 (6th Cir. 2014).

The Sixth Circuit has described rebuttal under the second manner of proving pretext as when:

> [T]he plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or cover-up.

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by, Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason," an employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). An employer has an honest belief in its rationale when it "reasonably relied 'on the particularized facts that were before it at the time the decision was made.' " *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). "An employer's reason for discharge does not have to be a *good* reason . . . to escape liability," so long as it is "based on grounds not proscribed by the statute." *Hoffman v. Prof'l Med Team*, 394 F.3d 414, 422 (6th Cir. 2005).

To establish the insufficiency of Defendants' proffered reasons under the third manner of proving pretext, Plaintiff must show by a preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [Plaintiff]." *Rhoades*, 559 F. App'x at 505 (quoting *Manzer*, 29 F.3d at 1084).

As to the first means of demonstrating pretext, Plaintiff has not shown by a preponderance of the evidence that Defendant's proffered reasons for the adverse

employment action had *no* basis in fact. Defendant relied on the facts provided in interviews with two employees, Lothian and Watkins, finding these employees to be more credible at the time than the others interviewed. An employer's reason for termination does not need to be correct, so long as there is at least some factual evidence to support the reason at the time of termination.

Plaintiff has similarly not shown by a preponderance of the evidence that Defendant's proffered reasons were not the true reason and that the true reason related to his FMLA-qualifying leave. Here, the Court was unable to find any statements in the record that connect Plaintiff's FMLA leave to his termination. Plaintiff states his supervisor encouraged him to take the time he needed when his father was ill and then passed away. Dkt. No. 14-12, pp. 10–11 (Pg. ID 445–46) ("He typed . . . do what you have to do to take care of your family." "I know he replied . . . once again, take care of your father. I hope all is well."). Plaintiff similarly admits that no one ever told him that Defendant terminated him for taking FMLA leave. Dkt. No. 14-12, p. 17 (Pg. ID 452).

Thus, Plaintiff appears to rely entirely on temporal proximity between his FMLA leave and termination to establish a causal connection. *See* Dkt. No. 14-12, p. 11 (Pg. ID 446); Dkt. No. 16-2, p. 36 (Pg. ID 538) ("Q: Okay. Tell me what he did. A: Well, he terminated me. Shortly after I came back from . . . what should have been FMLA leave and bereavement, a week later I was terminated. Or

approximately a week later."). It is true that "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005). However, the Sixth Circuit has previously concluded that a one-month difference between notification of leave and discharge is insufficient on its own to establish evidence of pretext. *Skrjanc*, 272 F.3d at 317.

Plaintiff has provided the Court with some evidence that may establish a question of fact as to whether his termination was attributable to Defendant's fear of unionization. While a reasonable jury could possibly conclude that union-related concerns were the true reason for terminating Plaintiff, Plaintiff has not provided any evidence—other than temporal proximity—that his termination even tenuously related to his FMLA-qualifying leave. Without more evidence relating specifically to his FMLA-qualifying leave, Plaintiff has not demonstrated by a preponderance of the evidence that Defendant's decision was pretext for FMLA retaliation.

Finally, Plaintiff has not demonstrated by a preponderance of the evidence that he was treated any differently than similarly situated employees outside the protected class. There is no evidence that Defendant treated the four other employees terminated on the same day as Plaintiff, based on the same allegations,[6]

---

[6] French is the only exception. Defendant terminated French for his conduct during the interviews, rather than any allegations that he performed non-work-related activities on company time. *See* Dkt. No. 14-9, p. 30 (Pg. ID 420) ("Jon

any differently than Plaintiff because these employees had not recently taken FMLA-qualifying leave.

Absent additional evidence that the adverse employment action was based on impermissible FMLA discrimination, such as differential treatment of similarly situated individuals who did not take FMLA leave, a reasonable jury could not infer that Defendant discriminated against Plaintiff based on his FMLA leave. *See Turner*, 854 F.3d at 929. The Court grants summary judgment to Defendant.

## V. CONCLUSION

For the reasons stated herein, the Court will **GRANT** Defendant's Motion for Summary Judgment [14].

SO ORDERED.

Dated: August 28, 2017                          /s/Gershwin A. Drain
                                                GERSHWIN A. DRAIN
                                                United States District Judge

---

French was disrespectful and uncooperative when questioned during the investigation. Jon French intentionally and deliberately communicated dishonest information, including information intended to damage another employee's . . . credibility.").